IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## STATE OF TENNESSEE v. JAYSON SORIANO

**Direct Appeal from the Criminal Court for Davidson County**
**No. 95-B-918      Seth Norman, Judge**

---

**No. M1999-00999-CCA-R3-PC - Decided June 30, 2000**

---

The Petitioner, Jayson Soriano, appeals as of right from the trial court's denial of post-conviction relief. On February 26, 1996, the Petitioner pleaded guilty in Davidson County to the second degree murder of his wife, Elena Soriano. He subsequently filed a petition for post-conviction relief alleging that his guilty plea was the result of ineffective assistance of counsel and that it was not knowing and voluntary. After an evidentiary hearing, the trial court denied relief. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the trial court affirmed.**

WELLES, J., delivered the opinion of the court, in which SMITH, J., and WILLIAMS, J., joined.

Henry R. Allison, III, Nashville, Tennessee, for the appellant, Jayson Soriano.

Paul G. Summers, Attorney General and Reporter, Jennifer L. Bledsoe, Assistant Attorney General, Victor S. Johnson, District Attorney General, Kymberly Hass, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Petitioner, Jayson Soriano, was indicted for first degree murder arising out of the death of his wife, Elena Soriano. In February 1996, the Petitioner pleaded guilty to the lesser included offense of second degree murder. He later filed a post-conviction petition alleging that his guilty plea was not knowing and voluntary and that he was denied the effective assistance of counsel. The trial court appointed counsel and held an evidentiary hearing. It then found that the Petitioner's trial counsel was effective and that the Petitioner failed to prove that his guilty plea was not knowing and voluntary; therefore, it denied relief. On appeal, the Petitioner phrases his issues only in terms of the ineffective assistance of counsel, but he argues that the trial court erred in failing to find that his counsel was ineffective and in finding that the plea was knowing and voluntary. He argues that trial counsel was ineffective for directing him to stop taking psychiatric medications prior to entering a plea, and that counsel was ineffective for directing him to give untruthful answers to the court on the issues of whether he was suffering from any mental disease or disability, whether he was taking medication for that condition, and whether he was able to understand the proceedings. He asserts

that "there was a reasonable probability that but for the errors of defense counsel, Jayson Soriano would not have pled guilty and would have insisted upon going to trial." The Petitioner further asserts that the trial court erred in not finding that he was insane or otherwise mentally incompetent at the time of his plea as a result of ineffective assistance of counsel due to counsel's advice to cease taking his medication. Essentially, the Petitioner argues that due to his counsel's ineffective assistance, his plea was not knowing and voluntary because he did not understand what he was doing. We find no error and affirm the denial of post-conviction relief.

At the hearing on the Petitioner's guilty plea, the State offered the following summary of the facts:

[D]uring the early morning hours of November the 11th of 1994 the defendant and the deceased, Elena Soriano, who was the defendant's wife, became involved in an argument. Accordingly to statements later made by the defendant the substance of this argument was that Mrs. Soriano wanted a divorce, and she wanted the defendant to leave their marital residence.

During the course of this argument the defendant took a loaded rifle and shot Mrs. Soriano four times. The defendant had purchased that rifle just hours before at a local K-Mart. And, according to the defendant, he had intended to use that rifle to commit suicide; however, as indicated, instead he shot and killed his wife.

The Petitioner then indicated that the State's recitation of the facts was true and correct. He also indicated that he understood the plea agreement, that his attorneys had thoroughly explained the agreement to him, that he understood what rights he was giving up by entering a plea, that he was satisfied with the representation of his attorneys, and that he wanted to enter a guilty plea to second degree murder. When the trial court asked the Petitioner if he was suffering from any mental illness, the Petitioner replied, "depression." The Petitioner answered in the affirmative when asked whether he was taking medication for depression. The trial court found that the plea was given voluntarily and accepted the Petitioner's plea.

At the hearing on the Petitioner's petition for post-conviction relief, the Petitioner testified that prior to his plea and during discussions with his two attorneys, David Siegel and Jeanne Broadwell, he was suffering from depression and A.D.D.S. He said that he had been prescribed and was taking Zoloft for depression and Wellbutrin for A.D.D.S. The Petitioner maintained that he ceased taking the medication approximately a month and a half before he entered the plea at the direction of his attorney, David Siegel. He asserted that after he quit taking the medication he was in a "constant haze," he could not concentrate on any one particular thing, and he was very depressed. He admitting telling the trial judge before entering his plea that he was taking medication for depression, but he maintained that Mr. Siegel told him to say that even though it was false.

The Petitioner testified that he discussed pleading guilty with Mr. Siegel and that he told Mr. Siegel that he did not want to enter a plea. However, Mr. Siegel advised the Petitioner to take the plea, claiming that if the Petitioner went to trial he would lose. The Petitioner said that Mr. Siegel did not go over his plea petition with him. He also maintained that Mr. Siegel did not discuss with

him how his case would be defended if he went to trial. He claimed that his defense would have been that the shooting was "a crime of passion" due to marital problems. He testified that he had intended to kill himself with the rifle in front of his wife, but he shot her instead. He said, "That wasn't meant to be, but that's what happened. . . . For me to kill her, she had gotten off too easy; to watch me do it, she would have suffered." He asserted that if he had not been so depressed after he quit taking medication for depression, he would not have pleaded guilty, and he would have insisted on going to trial. He claimed that he was "anxiety ridden" and that he "couldn't concentrate on anything" when he entered the plea.

When asked on cross-examination why he told the trial judge that he was taking his medication for depression, the Petitioner responded, "I misunderstood the question that he had asked. I thought he meant -- I answered the question as if he had asked if I was supposed to be taking medication." He then stated, "I just did what I was told to do." When asked if Mr. Seigel advised him to lie about voluntarily entering the guilty plea, the Petitioner said, "Mr. Siegel told me to answer questions with a 'yes, sir,' that was that."

David Siegel, the Petitioner's trial counsel, then testified. He stated that he was presently employed as an assistant professor of law at the New England School of Law in Boston, Massachusetts, but in June of 1996, he was an assistant public defender in Davidson County. He said that he was an assistant public defender for about five and a half years. As an assistant public defender, he handled a few hundred cases and tried about thirty felony cases. Of those thirty cases, fifteen to twenty were murder cases.

Mr. Siegel testified that he met with the Petitioner thirteen times at the Justice Center, and he talked with the Petitioner on the telephone on other occasions. He said that when he met with the Petitioner, he discussed the strength of the State's case. Mr. Siegel testified that he never had any difficulty communicating with the Petitioner and that the Petitioner was "certainly among the more articulate defendants [he] represented." He maintained that the Petitioner did not indicate that he did not understand the things they discussed about the case. Although the Petitioner maintained that the evidence would only support a voluntary manslaughter conviction, Mr. Siegel felt that if the case went to trial, the Petitioner would very likely be convicted of first degree murder. He said he told the Petitioner that the most he could hope for would be a second degree murder conviction. Mr. Siegel asserted that he discussed what defenses might be available with the Petitioner, but the Petitioner could not provide an explanation of why he shot his wife that would be credible to a jury. He said he discussed the possibility of a plea agreement with the Petitioner on multiple occasions, and he discussed that possibility on every meeting with the Petitioner the last week prior to the scheduled trial. In a letter to the Petitioner dated February 24, 1996, which was two days before the Petitioner entered the plea, Mr. Seigel and Ms. Broadwell memorialized their opinion that the Petitioner should accept a plea offer for second degree murder should the State make the offer. Before the Petitioner entered the plea on February 26, Mr. Siegel spent over one hour reviewing the plea petition with the Petitioner and discussing the offer. Mr. Siegel felt that a plea agreement was the best possible result, and he "did not believe that [he] would be effective as a lawyer if [he] did not settle this case."

In the course of preparing the Petitioner to testify at trial, the subject of the Petitioner's medication came up. Mr. Siegel testified that the week prior to trial, he and Ms. Broadwell spent several hours preparing the Petitioner for direct and cross-examination. Mr. Siegel was concerned about the Petitioner's lack of remorse. He said that "in order to effectively convey to the jury the heat of passion it would be necessary for that to come through in his responses to questioning." When Mr. Siegel discussed this with the Petitioner, the Petitioner informed him that "he, indeed, did feel differently but the medication affected him." Mr. Siegel then advised the Petitioner "that he should, then, not take the medication in preparation for trial because I thought if he was not able to emote sufficiently that the jury would not accredit his testimony." When questioned about this advice on cross-examination, Mr. Siegel responded, "If it was the medication that was making Mr. Soriano have a flat affect in describing the facts of the incident, then I believed it was in his best legal interest, in terms of presenting the best possible case, for him to discontinue that."

Mr. Siegel admitted that he did not discuss this advice with the Petitioner's doctor before telling the Petitioner to cease taking the medication. He said that he did, however, consult the Physician's Desk Reference to try to determine the side effects of the medication, and he obtained information about the medication from a doctor from Vanderbilt and from another doctor because some of the medication was found in the Petitioner's house when the incident occurred. Mr. Siegel also testified that he was familiar with the Petitioner's psychiatric history and that he had the Petitioner evaluated in preparation for trial. He and Ms. Broadwell prepared a lengthy mental health chronology regarding the Petitioner in preparation for trial.

Mr. Siegel testified that the Petitioner never said whether he had in fact ceased taking his medication. He maintained that he did not notice any difference between the Petitioner's mannerisms and behavior between the time the Petitioner claimed to have stopped taking the medication and the time of the entry of the guilty plea. Mr. Siegel offered his opinion that at the time the Petitioner entered his guilty plea, he did so voluntarily and knowing the consequences.

Mr. Siegel further testified that after the Petitioner had entered the guilty plea, the Petitioner contacted Mr. Siegel about the possibility of getting his sentence reduced. After Mr. Siegel explained that a reduction was not possible, the Petitioner confirmed that he did not want to withdraw his guilty plea.

Dr. Pamela Mary Auble, a clinical psychologist, testified that she reviewed the Petitioner's psychological and psychiatric records, but she did not meet with the Petitioner. Dr. Auble also reviewed the transcript from the Petitioner's plea hearing. She stated that the records revealed that the Petitioner "had a very long history of depression and that became major depression at times of stress and that resulted in some suicide attempts from time to time." The Petitioner had attempted suicide as early as 1977 by taking an overdose of pills. Dr. Auble explained that there are nine symptoms of major depression, and the patient must have at least five of those symptoms to be diagnosed. Those nine symptoms are: (1) recurrent thoughts of death or suicide; (2) diminished ability to think and concentrate nearly everyday; (3) feelings of worthlessness or excessive guilt nearly every day; (4) fatigue or loss of energy nearly everyday; (5) psycho-motor agitation or retardation, which means either "running around" without much direction or just sitting and staring;

-4-

(6) difficulty sleeping; (7) weight loss, weight gain, or appetite disturbances; (8) markedly diminished interest or pleasure in all or almost all activities most of the day, nearly everyday; and (9) depressed mood most of the day, nearly everyday. Dr. Auble testified that "these symptoms must cause clinically significant distress or impairment in social, occupational or other areas of functioning."

When asked what symptoms the Petitioner exhibited, Dr. Auble said the medical records indicated that the Petitioner had "suicidal ideation," that he would sit and stare without doing anything, which was consistent with psycho-motor retardation, that he exhibited fatigue or loss of energy, that he had feelings of worthlessness, that he had difficulty sleeping, and that he suffered from a depressed mood. Dr. Auble agreed that simply being incarcerated can and often does cause depression. She also testified that the Petitioner had taken various different anti-depressants at times. She said his records indicated that he was started on Prozac which was switched to Elavil and then switched again to Wellbutrin.

Dr. Auble offered the opinion that if the Petitioner had ceased taking his medication one month prior to entering his guilty plea as claimed, then his depression would have worsened. She also agreed with the Petitioner's counsel that giving false statements at the plea hearing "would be consistent with a lack of interest in what happened to him." She stated, "he may not have been able to think clearly enough to really evaluate what he was doing." However, Dr. Auble could not testify from personal knowledge what the Petitioner's mental condition was at the time he entered the plea.

On cross-examination, Dr. Auble was asked about two evaluations of the Petitioner by Vanderbilt Forensic Psychiatry, one in November and another in December of 1994. On both occasions, Vanderbilt physicians found the Petitioner to be malingering, which Dr. Auble said was the conscious production of symptoms. Dr. Auble also said that the personnel from Vanderbilt Forensic Psychiatry could not "rule out" major depression based on the evaluations.

When asked about certain things in the Petitioner's medical records, Dr. Auble testified that the Petitioner had voluntarily stopped taking Prozac on occasions before the murder of his wife because he could not afford the drug. She also said that in November of 1990 the Petitioner told his doctor that he was not going to take Prozac anymore because he felt that he was more agitated on the medication than he was off the medication.

After discussing the facts presented at the hearing, the trial judge stated in his opinion, "There is no proof in this record from which the Court could conclude that the attorney acted in any fashion other than in the petitioner's best interest. There is certainly no proof that the actions of the attorney were not that required in the community." Regarding the petitioner's claim that his plea was not knowing and voluntary, the trial judge stated that the petitioner failed to carry his burden of proof. The judge then denied the petition.

Relief under our Post-Conviction Procedure Act will be granted when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by either the Tennessee Constitution or the United States Constitution. Tenn. Code Ann. § 40-30-203. In Gideon

v. Wainwright, 372 U.S. 335 (1963), the Supreme Court held that the Sixth Amendment right to counsel was "'so fundamental and essential to a fair trial . . . that it is made obligatory upon the States by the Fourteenth Amendment.'" Id. at 340 (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). This right to counsel includes the right to effective counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984).

To determine whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To succeed on a claim that his counsel was ineffective at trial, a petitioner bears the burden of showing that his counsel made errors so serious that he was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the petitioner, resulting in a failure to produce a reliable result. Strickland, 466 U.S. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). To satisfy the second prong, the petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994). This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of the plea process. Hill v. Lockhart, 474 U.S. 52 (1985). The prejudice requirement is modified so that the petitioner "must show that there is a reasonable probability that, but for counsel's errors he would not have pleaded guilty and would have insisted on going to trial." Id. at 59.

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Counsel's alleged errors should be judged at the time they were made in light of all facts and circumstances. Strickland, 466 U.S. at 690; see Cooper 849 S.W.2d at 746.

If afforded a post-conviction evidentiary hearing by the trial court, a petitioner must do more than merely present evidence tending to show incompetent representation and prejudice; he or she must prove factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). When an evidentiary hearing is held, findings of fact made by that court are conclusive and binding on this Court unless the evidence preponderates against them. Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996); Cooper, 849 S.W.2d at 746 (citing Butler, 789 S.W.2d at 899).

After the Petitioner's evidentiary hearing, the trial court specifically found that Petitioner's trial counsel was effective. We conclude that the evidence does not preponderate against this determination. Despite the Petitioner's claims that at most his crime was voluntary manslaughter, Mr. Siegel was convinced that if the case went to trial, the Petitioner would very likely be convicted of first degree murder. He thought that he would not be effective if he did not settle the case. Even so, Mr. Siegel was attempting to prepare the Petitioner for trial. In so doing, he wanted the Petitioner to be able so show remorse for the killing to help convince the jury that it was really a "crime of passion." Because the Petitioner told Mr. Siegel it was his medication that prevented him from

-6-

showing emotions, Mr. Siegel told him to stop taking the medication. While we question the advisability of Mr. Siegel's actions in telling the Petitioner to quit taking medication prescribed by a doctor without the doctor's consent, we agree with the trial court's assessment that Mr. Siegel always had the Petitioner's best interests in mind. We cannot conclude that this advice constituted incompetent representation.

The Petitioner also claims that Mr. Siegel told him to lie to the trial court about taking his medication. When the trial court asked the Petitioner before accepting the plea whether he was taking medication for depression, the Petitioner answered, "yes." At one point, the Petitioner said that he answered "yes" because Mr. Siegel told him to do so, but at another point, the Petitioner said that he answered "yes" because he misunderstood the question. He said that he thought the question was whether he was supposed to be taking medication. Mr. Siegel was not asked whether he told the Petitioner to lie to the court, but he did testify that he did not know whether the Petitioner quit taking his medication. He said that he did not notice any difference in the way the Petitioner communicated and behaved between the time the Petitioner claimed to have quit taking the medication and the time he entered the guilty plea. It was Mr. Siegel's belief that the Petitioner wanted to enter the guilty plea. We conclude, as the trial court must have, that the Petitioner's proof did not establish by clear and convincing evidence that Mr. Siegel told the Petitioner to lie about taking medication.

Morever, even if Mr. Siegel's actions had been below the range of competence demanded by attorneys, we find that the Petitioner has failed to prove prejudice. The Petitioner alleges that but for Mr. Siegel's ineffective assistance, he would not have pleaded guilty and would have insisted on going to trial. This issue is intertwined with the Petitioner's final assertion, which is that the trial court erred in failing to find that the Petitioner was insane or otherwise mentally incompetent due to counsel's ineffective assistance. Essentially, the Petitioner asserts that because he quit taking his medication at the request of his attorney, his plea was not knowing and voluntary due to his mental condition. The Petitioner claimed that he was in a "constant haze" and that he could not think clearly because he had quit taking his medication for depression.

The United States Supreme Court has said that, in order to pass constitutional muster, a guilty plea must be voluntarily, understandingly, and intelligently entered. See Brady v. United States, 397 U.S. 742, 747 n. 4 (1970); Boykin v. Alabama, 395 U.S. 238, 243-44 (1969). In North Carolina v. Alford, 400 U.S. 25 (1970), the Supreme Court stated, "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." Id. at 31. In Boykin v. Alabama, 395 U.S. 238 (1969), the Supreme Court ruled that defendants should be advised of certain constitutional rights before entering guilty pleas, including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. Id. at 243. If the proof establishes that the accused was aware of his constitutional rights, he is entitled to no relief. Johnson v. State, 834 S.W.2d 922, 926 (Tenn. 1992). In determining whether a plea of guilty was voluntarily, understandingly, and intelligently entered, the court must consider all of the relevant circumstances that existed at the entry of the plea. State v. Turner, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995).

In the case of <u>John D. Barron v. State</u>, No. M199800031CCAR3PC, 1999 WL 1261826 (Tenn. Crim. App., Nashville, Dec. 29, 1999), this Court considered a somewhat similar issue to the one presented here. In that case, the petitioner alleged that his guilty plea was neither knowingly nor voluntarily entered because he entered the plea while he was not receiving his medication for depression and bipolar disorder. <u>See</u> <u>id.</u> at *1. The petitioner testified that he did not recall anything about the guilty plea proceeding and stated that if he had been taking his medication at the time, he "probably" would not have pleaded guilty. <u>Id.</u> The petitioner's trial counsel testified that she was unaware the petitioner was supposed to be taking medication but that she discussed the nature of the charges with the petitioner and his various options. <u>Id.</u> at *2. Counsel insisted that the petitioner understood his various rights and alternatives. <u>Id.</u> The trial transcript from the guilty plea hearing indicated that the petitioner acknowledged he was "taking [his] medication" at the time of the plea. <u>Id.</u> The trial court accredited the testimony of trial counsel that the petitioner "clearly understood what he was doing" and denied relief. <u>Id.</u> On appeal, we found that the evidence did not preponderate against the trial court's determination, stating,

> Because the trial court saw and heard the testimony of the witnesses firsthand, reviewed the transcript of the hearing on the guilty plea, and ultimately determined that the plea was knowingly and voluntarily made, the reasons for the denial of post-conviction relief are well founded. In our view, the evidence in this record does not preponderate against the findings of the trial court and the petitioner has been unable to demonstrate by clear and convincing evidence that an untreated mental condition at the time of the disposition of his case rendered his guilty plea as either unknowing or involuntary.

We reach the same conclusion here as well. Although the Petitioner testified that he was in a "constant haze" and that he could not concentrate on any one particular thing when he entered the plea, his attorney, Mr. Siegel, testified that he believed the plea was entered voluntarily and that the Petitioner knew what he was doing. Mr. Siegel testified that the Petitioner was one of the most articulate persons he had defended, and the Petitioner never indicated that he did not understand the things they discussed. Mr. Siegel said that he did not notice a difference in the Petitioner's mannerisms or behavior between the time the Petitioner claimed to have stopped taking the medication and the time of the plea. Mr. Siegel further testified that he had discussed the possibility of a plea from the beginning of his representation and that he spent over an hour the day of the plea going over it with the Petitioner and explaining it. The transcript of the plea proceeding shows that the Petitioner was informed of his rights. The Petitioner indicated to the trial court that he understood his rights, that he knew what he was doing, and that he wanted to enter the plea. Before accepting the plea, the trial court found that the plea was entered voluntarily. Dr. Auble testified that if the Petitioner had ceased taking his medication as claimed, his depression would have worsened; however, Dr. Auble was unable to testify as to the Petitioner's mental state at the time he entered the plea.

Accepting as true the Petitioner's assertion that he ceased taking his medication, he still failed to prove by clear and convincing evidence that his untreated condition rendered his plea involuntary.

Obviously, the trial court accredited Mr. Siegel's testimony that the Petitioner knew what he was doing. We cannot say that the evidence preponderates against the trial court's determination.

Accordingly, we hold that the Petitioner failed to prove his plea was entered involuntarily; thus, he also failed to establish prejudice as a result of his counsel's actions in advising him to cease taking his medication. Therefore, even if counsel was deficient for so advising him, he is entitled to no relief. The judgment of the trial court is affirmed.